**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-2603

JOHN ELDER, an Individual,

      Plaintiff,

v.

COLORADO STATE UNIVERSITY, a public university in Colorado,

      Defendant.

---

### COMPLAINT WITH JURY DEMAND

---

    COMES NOW Plaintiff John Elder, by and through undersigned counsel, Robinson & Henry, P.C., for his complaint against Colorado State University, a public university in Colorado, and states as follows:

### I.  INTRODUCTION

1. This is a civil action brought pursuant to two separate claims: (1) discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964; and 2) retaliation in violation of Title VII of the Civil Rights Act of 1964.

2. Plaintiff seeks damages and other relief for wrongful discrimination and retaliation after participating in a protected activity.

### II.  PARTIES

4. Plaintiff John Elder ("Plaintiff") is an individual who resides in the state of Colorado.

5. Defendant Colorado State University ("Defendant" or "CSU") is a public university that receives federal funding and operates in the state of Colorado.

### III. JURISDICTION & VENUE

6. The Court has federal subject matter jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331 as this action concerns a civil action arising under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964.

7. Plaintiff has exhausted all administrative remedies available before filing this Complaint. ***See*** **Exhibit 1, Determination and Notice of Rights**.

8. Venue is proper in this court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b), as all or most of the events giving rise to this action occurred in the District of Colorado.

### IV. GENERAL ALLEGATIONS

9. Plaintiff is employed as a professor in the Department of Finance and Real Estate ("the Department") at Defendant.

10. Beth Walker serves as Dean of the Department.

11. Costanza Meneghetti serves as the Department's Chair.

12. Hilla Skiba serves as the Department's Chair.

13. Since 2022, at least five mail faculty members have submitted complaints of discrimination in the Department under Ms. Walker, Ms. Meneghetti, and Ms. Skiba.

14. Ms. Meneghetti has initiated or completed disciplinary actions against at least four male faculty members and threatened others.

15. Defendant has engaged in discriminatory hiring practices for years through their Search Manuals and Toolkits. In the "Faculty Recruitment Toolkit," Defendant explicitly states, "[w]hile preparing for a [faculty] search, there are many opportunities to embed best practices for enhancing diversity, equity, and inclusion."

16.     Defendant annually published goals for women and minorities in the Colorado State University Affirmative Action Plan. Defendant emphasized its goal of increasing female representation in their Search Manual. The CSU Search Manual contains contradictory directives regarding the establishment of hiring goals. On one hand, the Search Manual states that hiring goals "are established for each department, unit, school, or division, as appropriate, in accordance with U.S. Department of Labor regulations." On the other hand, the same section states that "goals are determined through consultation with the appropriate dean, director, or department head/chair."

17.     Ms. Walker stated that she wanted 50% of the Department's faculty to be female, even though the Department's pool of qualified female applicants has been substantially fewer than 50%. Ms. Walker stated that the portion of the faculty application pool who were minorities was so small that the college should instead concentrate on recruiting female faculty.

18.     In 2017, Defendant announced the formation of the Feminist Fight Club. The Feminist Fight Club became an official university organization and eventually excluded males from participating.

19.     The Feminist Fight Club advocated employment practices against males that are inconsistent with employment law.

20.     Members of the Feminist Fight Club at CSU were required to take an oath to fight "patriarchy."

21.     Its literature promoted sex-based discrimination and harassment by making many disparaging and derogatory statements about males, including "moves" such as "Enlisting Men as Allies" with a "Penile Service Announcement."

22.  Many other "moves" such as "support for working moms" specifically omitted support of males in the same situation.

23.  The rules for Feminist Fight Club as described in its guide are:

a.  Rule No. 1: You must talk about the Feminist Fight Club at Colorado State University.

b.  Rule No. 2: You MUST talk about the Feminist Fight Club at Colorado State University.

c.  Rule No. 3: We fight PATRIARCHY (and all forms of harassment, bullying, inequity, discrimination, -isms, and -phobias), not each other.

d.  Rule No. 4: Membership to the Feminist Fight Club means you've taken an oath to help and support women – ALL women – and those from historically marginalized groups.

e.  Rule No. 5: The Feminist Fight Club is inclusive and non-hierarchical. Everyone's an equal fighter.

f.  Rule No. 6: The fight is not over until we have achieved gender equity for all people.

g.  Rule No. 7: No wallflowers. Everyone must fight!

24.  Other widely circulated Feminist Fight Club documents included comments such as: "All Woman Everything," "Girls Rule," "GIRL GANG," "Ready for Combat," "RIOT," "Bro-free Workplace," "Know the Enemy," and "WWJD - What Would Josh Do?" where Josh represents a caricature of a "mediocre white man."  More vulgar language includes:  "FUCK YEAH FFC," "Find a Boast Bitch," "Pussy Posse," and "F you Pay me."

25.    Ms. Walker's strategic plan for the Department included a commitment to "modernize" curriculum with "JDEI," mirroring the Feminist Fight Club handout. Ms. Walker and other administrators engaged in Feminist Fight Club Meetings, including "MOVES: Gender Bias in Workplace" - a Workshop Series with Cory Wong (February 2, 2017).

26.    Discrimination against males was so institutionalized that former CSU President Joyce McConnell's cabinet included just three males, out of about 25 members. As of December 2025, the Provost Leadership Council under former Provost Marion Underwood included just 20% males.

27.    The Women and Gender Collaborative and the Feminist Fight Club were renamed and reorganized following former President Joyce McConnell's termination of employment. Administrators were subsequently required to take DEI training from the Faculty Institute for Inclusive Excellence.

28.    Ms. Walker and her department chairs, Ms. Meneghetti and Ms. Skiba, initiated or completed adverse employment actions against at least three out of six tenured/ male faculty members, plus one male non-tenure track faculty member in the Department.

29.    Ms. Walker tried to disguise her actions through her department chairs. An internal CSU Office of Equal Opportunity report (11/07/22) regarding a different complaint against Ms. Walker found that, "There can be a perception from Walker that the decision-maker is lower level than the dean therefore removes Walker many of the daily operational decisions. As a leader, the dean has a responsibility to intervene and display leadership." *See* **Exhibit 2 – OEO Report.**

30.    Ms. Walker and her staff referred to Plaintiff by his initials "JE" in internal communications to coordinate actions against Plaintiff and to circumvent the Colorado Open

Records Act.  This included emails from Senior Executive Assistant to the Dean, Melissa E. Helfrich; Senior Human Resources Manager for the Dean, Chelsey Lane; and Ms. Meneghetti.

31.    In July 2022, Ms. Walker claimed to be concerned about Plaintiff's actions. Ms. Walker called CSU Human Resources, and current Vice President for Human Resources Eric Ray investigated. Mr. Ray concluded that a written report was not justified. Several days afterward, Ms. Walker consulted with Vice Provost for Faculty Affairs Susan P. James and called CSU police. CSU police determined that there was no reason for Ms. Walker to call them.

32.    During late 2022 and early 2023, Ms. Meneghetti recommended that male candidates be denied promotion. Plaintiff believed this action to be discriminatory and submitted a memo supporting a male faculty member for promotion from Plaintiff's position as Chair of the Promotion and Tenure Committee. Plaintiff's memo accurately summarized external reviews and CSU policy.

33.    After Plaintiff submitted the memo, Ms. Meneghetti threatened and harassed Plaintiff for weeks. Ms. Meneghetti falsely accused Plaintiff of wrongdoing and directed numerous email threats at Plaintiff, alleging misconduct such as "unconscionable" and a "serious breach of protocol" that "needed to be dealt with," and stating that she is "very troubled by this behavior" and "believes it should be addressed promptly."

34.    Ms. Meneghetti continued to issue threats against Plaintiff even after administrators repeatedly emailed her, instructing her that Plaintiff had done nothing wrong. Ms. Meneghetti said that those who orchestrated this harassment "did not want to be identified" but subsequently identified Ms. Walker and Ms. Helfrich.

35.    Ms. Walker recommended that this male candidate be denied promotion and submitted her memo after 5pm on the evening before her meeting with the Provost. CSU policy permits the

candidate to respond to Ms. Walker's recommendation to deny promotion, but Ms. Walker purposefully made that almost impossible. Ms. Meneghetti's recommendation to deny promotion to the male candidate was ultimately ruled "unreasonable" and "unfair." Ms. Walker's recommendation to deny promotion to the male candidate was also ultimately ruled "unreasonable" and "unfair."

36. On or about December 8, 2022, Ms. Meneghetti and Ms. Skiba drafted a groundless complaint to the Office of Equal Opportunity ("OEO") against a coworker who had previously submitted a good faith report of discrimination.

37. Internal communications reveal that Defendant's administrators, including Ms. Meneghetti and Ms. Skiba, coordinated to initiate these groundless investigations. Ms. Skiba explicitly wrote: "We do need a reason in the memo why we are sending it to OEO."

38. Internal communications also reveal that Defendant's administrators, including Ms. Meneghetti and Ms. Skiba, coordinated to investigate male faculty for confidential promotion and tenure discussions. In one false accusation, Ms. Skiba explicitly wrote: "I thought it was Elder" but later identified others.

39. On or about February 28, 2022, Ms. Skiba, as orchestrated by Ms. Walker, directed a Letter of Expectations ("LOE") toward Plaintiff, which was ultimately determined to be unreasonable. Plaintiff still adhered to this unreasonable LOE for at least 18 months.

40. On or about April 13, 2023, Ms. Meneghetti and Ms. Walker issued the first Letter of Reprimand ("LOR") directed at Plaintiff, which was ultimately determined to be unreasonable.

41. On June 30, 2023, Ms. Walker and Ms. Meneghetti issued a new statement to a grievance committee bringing forward new allegations and sensational claims of "fears" about Plaintiff's future behavior. They had no evidence to support these claims.

43. Ms. Walker's assistant, Ms. Helfrich, claimed that she had taken extraordinary safety measures for many months to avoid and protect herself from Plaintiff. But neither Ms. Walker, Ms. Meneghetti, nor Ms. Helfrich had ever made any request that Plaintiff limit contact with them in any way.

44. On at least two occasions after these complaints of safety concerns, Ms. Walker tried to physically approach Plaintiff. Plaintiff avoided the interaction.

45. On at least one occasion after these complaints of safety concerns, Ms. Meneghetti physically approached Plaintiff by entering his office and closing the door until it was "cracked." Ms. Meneghetti subsequently admitted that approaching Plaintiff in his office was unnecessary, by writing "I will send you the written request you asked for shortly."

46. On at least one occasion after these complaints of safety concerns, Ms. Meneghetti and Ms. Skiba physically approached Plaintiff by showing up unannounced at a dinner meeting that Plaintiff was scheduled to attend.

47. Ms. Skiba and Ms. Meneghetti coerced "anonymous" statements from other faculty, including a statement from coworkers, who texted Plaintiff's personal cell phone, met with Plaintiff privately and/or emailed Plaintiff extensively from 2019 to 2021 and again in 2025-2026.

48. Ms. Skiba called Plaintiff's personal cell phone as recently as February 2022 and texted Plaintiff a personal cell phone as recently as August 2021 requesting assistance in teaching courses and in passing a curricular proposal, which Plaintiff provided.

49. After investigations, CSU found that: (1) "Costanza Meneghetti and Beth Walker also participate in conflict resolution training;" (2) the "LOE [to Plaintiff] was constructed so poorly that it probably did more harm than good;" (3) the LOE "created problems with regard to having his computer issues analyzed properly;" (4) the LOE "instructed [Plaintiff] not to discuss his

computer issues" with "IT personnel in the college;" (5) the LOE "was too broad and didn't create a clear pathway through which [Plaintiff] could seek support;" (6) the LOE resulted in Ms. Meneghetti making "requests for [Plaintiff] to violate the LOE;" and (7) "[Ms.] Meneghetti and [Ms.] Walker could have worked better with [Plaintiff]" to "get his computer issues resolved."

50.     The remaining accusations by Ms. Meneghetti, Ms. Walker, and others are shown to be false by their own actions, internal emails, and text messages.

51.     Ms. Meneghetti texted Ms. Walker that the grievance-hearing report against Plaintiff amounted to a "weak win or tie," reflecting that their primary concern was securing a favorable outcome for themselves rather than addressing or preventing the discriminatory alleged conduct directed at Plaintiff.

52.     CSU, through Ms. Meneghetti and others, retaliated against Plaintiff in response to Plaintiff's complaints of discrimination by harassing Plaintiff and coworkers who cooperated with Plaintiff in response to his complaint, obstructing an investigation into their actions related to Plaintiff's complaint, and continuing to create a hostile work environment based on protected class.

53.     In March, April, and May of 2025, Ms. Meneghetti took several adverse actions against Plaintiff and faculty whom Ms. Meneghetti described as "John's followers" and "John's Chinese followers" in continued retaliation for Plaintiff's complaints of discrimination. Ms. Meneghetti took these actions through her annual evaluations of faculty, harassing colleagues, and aggressively attempting to coerce colleagues to support false allegations against Plaintiff with thinly veiled threats.

54.     On or about March 10, 2025, Ms. Meneghetti indicated that she was upset about Plaintiff's requests for her records under the Colorado Open Records Act related to Plaintiff's complaint.

55.     On or about March 12, 2025, Ms. Meneghetti met with Plaintiff's coworker and indicated that she was "concerned" about "others" while repeatedly threatening Plaintiff's coworker's work schedule.

56.     On or about April 11, 2025, Ms. Meneghetti contacted a coworker by cell phone in her office and described Plaintiff and/or his colleagues as "predators."

57.     On or about May 20, 2025, Ms. Meneghetti contacted a coworker at home and claimed that the coworker was a witness to an alleged event involving Plaintiff that occurred 6-10 years ago. The coworker repeatedly indicated that she did not recall such an event.  The phone call was "loud" and "stressful" as Ms. Meneghetti repeatedly "circled back" to the false allegations against Plaintiff that Ms. Meneghetti coerced the employee to confirm. Ms. Meneghetti made veiled threats to get evidence of alleged misconduct against Plaintiff from this coworker.

58.     Ms. Meneghetti's threatening actions were reported to the University Grievance Officer, who then reported these events to the Office of General Counsel and the Vice Provost for Faculty Affairs Susan James.

59.     On or about July 29, 2025, Plaintiff expressed concerns related to constructive failure of a new work assignment, which required cooperation with Ms. Walker's staff. Plaintiff requested relief from the current assignment. Ms. Meneghetti refused and replied by directing hostility toward Plaintiff, writing, in part: "This pattern of hostile and unprofessional behavior has persisted for years and must come to an end. Continuing to make false claims is a hostile act that damages the professional environment, undermines the standards we all rely on to work effectively, and harms both the functioning of the department and the well-being of your colleagues."

60.     Ms. Meneghetti consistently gave lower scores and negative comments on annual evaluations to Plaintiff despite Plaintiff outperforming similarly situated female coworkers.

## V.    FIRST CLAIM FOR RELIEF
### Discrimination Based on Sex

61.    Plaintiff fully incorporates the above paragraphs as if fully set forth herein.

62.    While Plaintiff is a member of a historically favored group, background circumstances exist that support the suspicion that Defendant is that unusual employer who discriminates against the majority.

63.    Plaintiff suffered disparate treatment at the hands of Defendant when Plaintiff received unsupported disciplinary actions and lower evaluation scores than similarly situated female employees.

64.    This disparate treatment was based on Plaintiff's sex.

65.    As a result of Defendant's actions, Plaintiff suffered harm.

## VI.    SECOND CLAIM FOR RELIEF
### Retaliation

66.    Plaintiff fully incorporates the above paragraphs as if fully set forth herein.

67.    Plaintiff engaged in protected activity when he advocated that a male colleague be promoted despite leadership's discriminatory position, advocated for his and others' rights under Title VII, and reported the discriminatory acts of supervisors to HR and others.

68.    Plaintiff received unsupported disciplinary actions and lower evaluation scores than similarly situated female employees after these reports were made.

69.    There is a causal link between the protected activity and the adverse action, given the supervisors' statements and the time between the protected activity and the adverse action.

70.    As a result of Defendant's actions, Plaintiff suffered harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and

against Defendant, and award Plaintiff all relief as allowed by law, including, but not limited to the following:

1.    Declaratory relief, as appropriate;

2.    Lost economic damages, including past and future wages, benefits, and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions, in an amount to be proven at trial;

3.    Compensatory damages, including damages for Plaintiff's emotional distress, humiliation, and destruction to reputation, in an amount to be proven at trial;

4.    Punitive damages as allowed by law, in an amount to be determined at trial;

5.    Liquidated damages and/or penalties;

6.    Pre-judgment and post-judgment interest at the highest lawful rate;

7.    Attorney's fees and costs of suit pursuant to 42 U.S.C. §1988(b) and any other provisions in any federal or State of Colorado law governing the actions forming the basis of this action; and

8.    Such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims so triable.

Dated this 11th day of June 2026.

/s/ Joseph J. Lico
Joseph J. Lico, #29944
Glenn D. Germany, #59722
ROBINSON & HENRY, P.C.
8000 S. Chester Street, Suite 125
Centennial, Colorado 80114
joseph.lico@robinsonandhenry.com
glenn.germany@robinsonandhenry.com
Phone: (720) 453-1566
*Attorneys for Plaintiff*